REQUESTED BY: David Heineman Nebraska State Treasurer
You have requested our opinion with respect to two questions involving recent legislation pertaining to the use of credit cards by the State and several additional questions involving your authority to conduct banking business on behalf of the State as Nebraska State Treasurer. A number of those questions also involve issues pertaining to the University of Nebraska and the government of the University under the Nebraska Constitution. Our responses to your various questions are set out below. We will divide those responses as they pertain to questions regarding credit cards and questions regarding your authority as State Treasurer with respect to the banking relationships of the State. In each case, we will set out your entire question and then offer our response.
Use of Credit Cards by State Agencies and the University
During the 1997 legislative session, the Nebraska Legislature passed LB 70, 1997 Neb. Laws LB 70 (codified as is pertinent at Neb. Rev. Stat. §§ 13-609 and 81-118.01 (Supp. 1997)), which generally authorizes governmental subdivisions and state agencies in Nebraska to accept credit card payments as cash payments in certain instances. Section 81-118.01(1) states:
 Any state official or state agency may accept credit cards, charge cards, or debit cards as a method of cash payment of any tax, levy, excise, duty, custom, toll, interest, penalty, fine, license, fee, or assessment of whatever kind or nature, whether general or special, as provided by section 77-1702.[1]
In addition, Section 81-118.01(3) grants "any state official or state agency operating a facility in a proprietary capacity" similar authority to accept credit cards as a means of cash payment. Section 81-118.01(5) then goes on to provide, in pertinent part:
 The types of credit cards, charge cards, or debit cards accepted and the services provided for any state official or state agency shall be determined by the State Treasurer and the Director of Administrative Services with the advice of the committee convened pursuant to subsection (5) of section 13-609.[2] The State Treasurer and the director shall contract with one or more credit card, charge card, or debit card companies or third-party merchant banks for services on behalf of the state and those counties, cities, and political subdivisions that choose to participate in the state contract for such services.
Your initial questions focus on the University of Nebraska as a state agency under LB 70, and to what extent, if at all, the requirements of that bill dealing with acceptance of credit cards by state agencies pertain to it.
 Question No. 1. "Is the University of Nebraska a "state official or state agency" as described in LB 70 and as such required to comply with this statute?"
LB 70 does not contain any definition for the terms "state official" or "state agency." Moreover, we have reviewed the legislative history of that bill, and those materials offer little guidance as to the meaning of those terms. However, several Nebraska cases do offer some insight on the question of whether the University of Nebraska is a "state agency."
First of all, in Board of Regents of the University ofNebraska v. County of Lancaster, 154 Neb. 398, 48 N.W.2d 221
(1951), a lawsuit by the Regents against Lancaster County on a claim for drugs and medicines furnished to indigent patients sent to University Hospital, the court indicated that the Board of Regents is an "administrative agency of the state." Id. at 402,48 N.W.2d at 223. More recently, in Catania v. University ofNebraska, 204 Neb. 304, 282 N.W.2d 27 (1979), overruled on othergrounds Blitzkie v. State, 228 Neb. 409, 422 N.W.2d 773 (1988), the court indicated that the University is a state agency for purposes of the State Tort Claims Act.[3] Finally, inState ex rel. Spire v. Conway, 238 Neb. 766, 472 N.W.2d 403
(1991), a case which involved the state Separation of Powers clause and simultaneous service by a member of the Legislature as a teacher in a state college, the court stated:
 While the Board of Regents is an "independent body charged with the power and responsibility to manage and operate the University," it is, nevertheless, an administrative or executive agency of the state.
Id. at 786, 472 N.W.2d at 415 (citations omitted). On the basis of those various cases, it appears to us that the University is a "state agency" which would fall under the language of LB 70. In addition, we believe that the term "state official" in that legislation, given its ordinary meaning, is broad enough to cover members of the University's Board of Regents. Therefore, in our view, the University is a "state official" or a "state agency" under the language of LB 70.
Apart from construction of the statutory language found in LB 70, your first question regarding the requirements placed upon the University with respect to compliance with that legislation also raises issues under the Nebraska Constitution. Those issues arise as a result of Board of Regents of the University ofNebraska v. Exon, 199 Neb. 146, 256 N.W.2d 330 (1977).
The Exon case involved a declaratory judgment action by the University Board of Regents to determine the constitutionality of certain statutes under Art. VII, § 10 of the Nebraska Constitution. That constitutional provision states, as is pertinent:
 The general government of the University of Nebraska shall, under direction of the Legislature, be vested in a board of not less than six nor more than eight regents to be designated the Board of Regents of the University of Nebraska, who shall be elected from and by districts . . .
At issue in the Exon case was a general appropriation bill which contained numerous statements directing the Board of Regents or employees of the University to take certain actions. In addition, the Court considered whether a number of other statutes which pertained generally to state agencies and governed such matters as acceptance of gifts, raises to be given employees, and participation in such state functions as central data processing, planning and design for new facilities and centralized state purchasing could constitutionally be applied to the University under Art. VII, § 10.
In Exon, the court ultimately concluded that:
 . . . although the Legislature may add to or subtract from the powers and duties of the Regents, the general government of the University must remain vested in the Board of Regents and powers or duties that should remain in the Regents cannot be delegated to other officers or agencies.
Id. at 149, 256 N.W.2d at 333. Consequently, the statements in the general appropriation bill at issue in that case which contained directions to the Board of Regents and University employees were held to be advisory only and not mandatory. Id. at 149, 256 N.W.2d at 333. Moreover, the other statutes governing the various practices of state agencies were held to be inapplicable to the University because, if applied to that agency, they would result in an unlawful delegation of the authority vested in the Regents by the Constitution. Id. at 152, 153, 256 N.W.2d at 334, 335. The Court also held that while the Legislature has complete control of the money appropriated to the University from the general revenue of the State, the funds of the University not derived from taxation can be expended only by the Board of Regents for the University, and no annual appropriation of those monies is required when they are once set apart and appropriated for the use of that institution. Id. at 151, 152, 256 N.W.2d at 333, 334.
In the present instance, it could be argued, under Exon, that the choice of credit cards to be used by the University together with the nature of the contracts for credit card services for the University are matters involving the general government of that institution which cannot be delegated under LB 70 to other officers such as the State Treasurer. However, while the issue is certainly not without some doubt, we believe that the better argument is to the contrary, for the reasons discussed below.
First of all, while Exon provides that the "general government" of the University must remain vested in the Board of Regents, it does not state that all statutes which pertain to state government have no application to the University. As we noted in 1979-1980 Rep. Att'y Gen. 166, 167 (Opinion No. 117, dated May 16, 1979):
 Despite what Board of Regents v. Exon says, the Board of Regents is probably not totally insulated from the impact of general laws passed by the Legislature. When the Legislature attempts to specifically direct or control actions of the Board, the legislation is suspect. But we do not believe the court intended to say that the Board could ignore laws of general application. [The Board of Regents] . . . is not, after all, a separate, independent sovereignty.
As a result, it seems to us that statutes which pertain generally to state agencies and which do not purport to direct the Board of Regents as to matters which are central to the University's educational function or its "government," can have application to the University, even under Exon. To some extent, examples of such statutes include those described in University PoliceOfficers Union, International Brotherhood of Police Officers,Local 567 v. University of Nebraska, 203 Neb. 4, 277 N.W.2d 529
(1979) in which the Court stated that the University is subject to actions before the Court of Industrial Relations, to the Nebraska Workmen's Compensation Law and the Nebraska Employment Securities Law. In a similar fashion, we do not believe that subjecting the University to the general state credit card arrangements made by the State Treasurer for all state agencies intrudes, in any significant sense, in the University's educational function or its "government." For that reason, we believe that LB 70 is acceptable under the Exon decision.
We also believe that the decision in the Exon case does not invalidate the requirements of LB 70 for another reason. In theUniversity Police Officers case, supra, the Court pointed out that Art. VII, § 10 of the Nebraska Constitution must be read in connection with the other provisions of the Nebraska Constitution. In that regard, the office of the Nebraska State Treasurer has existed as a constitutional and Executive Branch office since the first Nebraska Constitution was approved by the people of the State in 1866. Neb. Const. of 1866, art. III, § 1 (1867). Therefore, the authority of the University Board of Regents under Art. VII, § 10 of the Nebraska Constitution must be considered in light of Art. IV, § 1 and the fact that the Nebraska Constitution also contemplates the existence of and duties for the office of State Treasurer.
This office has indicated in previous opinions that constitutional officers such as the State Treasurer have certain core functions and inherent constitutional authority which cannot be removed by legislative enactment. Op. Att'y Gen. No. 93012 (March 4, 1993); 1969-70 Rep. Att'y Gen. 164 (Opinion No. 110, dated May 5, 1970). Our research discloses that, since the inception of statehood in Nebraska, the State Treasurer has had the duty to receive and keep all money of the State not expressly required to be received and kept by some other officer. Neb. Rev. Stat. § 84-602(1) (1994); Neb. Rev. Stat. 1866, c. 4, § 18. Moreover, since 1891, the State Treasurer has had authority to deposit the funds of the State in his keeping in state and national banks. Neb. Rev. Stat. § 77-2301 (1996), 1891 Neb. Laws, c. 50, § 1, p. 347. It is also generally accepted that the Treasurer of a state has, by law, the custody of the monies of the State. 81A C.J.S. States § 135. Based upon those historical duties of the State Treasurer, it seems to us that the core functions of that office would clearly include maintaining custody of state funds. Arguably, those core functions would also include general supervision of State's relationships with state and national banks.
Since Art. VII, § 10 of the Nebraska Constitution must be read together with Art. IV, § 1, and since the core functions of the State Treasurer seem to include those matters enumerated above, we believe that the general government of the University vested in the Board of Regents under the Nebraska Constitution may only be exercised in such a way as to preserve the Treasurer's general authority over the custody of state funds and the supervision of the State's relationships with state and national banks. Therefore, the credit card provisions of LB 70 appear acceptable under the Exon case because they involve the Treasurer's general supervision of matters related to the State's business with banks. On the other hand, it remains clear underExon that the Treasurer's authority with respect to state funds and general supervision of the State's relationships with banks cannot be used to intrude upon the authority of Board of Regents in the general government of the University.
 Question 2. "LB 70 also amends 23-1601, Section 2 and refers to county treasurer, county official, or political subdivision official. Regarding this part of LB 70, is the University of Nebraska a political subdivision and therefore has an option whether to participate or not in the state's credit card contract?" 
Section 2 of LB 70 (codified at Neb. Rev. Stat. §13-609(5) (Supp 1997)) allows counties, cities and "other political subdivisions" that choose not to participate in the state credit card contract to negotiate and contract independently or collectively with credit card companies or other financial institutions for the provision of credit card services. Your second question goes to whether the University is a "political subdivision" under that portion of LB 70.
In Catania v. University of Nebraska, supra, the Nebraska Supreme Court considered whether a negligence action against the University of Nebraska should be brought under the State's Political Subdivisions Tort Claims Act or the State Tort Claims Act. Ultimately, the Court concluded that the University is a state agency which must be sued under the State Tort Claims Act rather than a political subdivision of the State. The Court came to that conclusion, in part, because some of the indicia of a political subdivision such as geographical area and boundaries and the power to tax do not apply to the University. The Court stated:
 The University is statewide in its service, has no geographical limitations in the boundary sense of the word and has no power to levy taxes. It is completely dependent, initially at least, on the appropriations made by the Legislature, as are all state agencies.
Id. at 308, 309, 282 N.W.2d at 30. The Court added, ". . . considering our own statutes and constitutional provisions as well as our own case law, we believe and hold that the Board of Regents of the University of Nebraska is an agency of the state." Id. at 311, 282 N.W.2d at 31, 32. For the reasons discussed in theCatania case, we do not believe that the University is a political subdivision for purposes of LB 70, and that the University does not have an option to decline to participate in the state credit card contract under § 13-609(5).
 Treasurer's Authority to Establish Banking Relationships for the State
The second group of questions included in your opinion request letter go to your authority as State Treasurer to establish the banking relationships for the State of Nebraska. You cited a number of provisions to us in Chapter 77 Article 23 of the Nebraska Statutes, the Article pertaining to the "Deposit and Investment of Public Funds." Your various questions are in that area.
 Questions No. 3. "In reviewing the above statutes and related statutes, does any state official or state agency, other than the State Treasurer, have the authority to establish a banking relationship on behalf of the State?" 
Two of the Nebraska statutes which you cited to us in regard to this question are Neb. Rev. Stat. § 77-2301 (1996) and Neb. Rev. Stat. § 77-2309 (1996). Section 77-2301, provides, as is pertinent:
 The State Treasurer shall deposit, and at all times keep on deposit for safekeeping, in the state or national banks, or some of them doing business in this state and of approved standing and responsibility, the amount of money in his hands belonging to the several current funds in the state treasury.
Section 77-2309 states:
 It is made the duty of the State Treasurer to use all reasonable and proper means to secure to the state the best terms for the depositing of the money belonging to the state, consistent with the safekeeping and prompt payment of the funds of the state when demanded.
We are unaware, generally, of any other statutes which specifically give other state officials or state agencies the authority to deposit the state's funds in a bank. As a result, to the extent that "establishing a banking relationship" in your question is synonymous with depositing funds in the state treasury in a bank, we believe that your office is the only agency with such authority.[4]
 Question No. 4. "Regarding the receipt and disbursement of University funds, including non state (sic) tax sources, are all University funds to be receipted through the State Treasurer's Office?"
Several Nebraska Statutes have a bearing on your fourth question. Neb. Rev. Stat. § 85-128 (1994) provides:
 The State Treasurer shall be the custodian of all the funds of the university. Disbursements from the funds named in sections 85-124 to 85-127 [the Temporary University Fund, the University Cash Fund, the United States Morrill Fund, and the United States Experiment Station Fund] shall be made in accordance with the provisions of law relating to the disbursement of university funds in the hands of the State Treasurer as provided by law.
Neb. Rev. Stat. § 85-129 (1994) provides:
 The State Treasurer shall be the treasurer of the state university and the custodian of all funds donated to the university or to the Agricultural Research Division by the United States, including the Morrill, Hatch, and Adams funds, all other donations, gifts, and bequests, income from land and productive funds, fees paid by students, and all funds for the use of the university derived from any source, except (1) funds created by taxation and paid into the state treasury as taxes, and (2) the University Trust Fund which shall be held and managed in the manner provided by section 85-123.01.
Finally, under Neb. Rev. Stat. § 85-123.01 (1994), the University Trust Fund, which consists of all property, real or personal, acquired by the Board of Regents by donation or bequest to it, "shall be held and managed in such manner as the Board of Regents . . . shall determine."
When those various statutes are read in their entirety and together, as they must be, it appears to us that the State Treasurer is the custodian of all funds of the University and of all funds donated to the University except those funds created by taxation and those funds in the University Trust Fund. We believe that authority to act as custodian necessarily implies that the funds in question will be receipted into the State Treasury. Consequently, for those funds for which you are the custodian, we believe that they should be receipted into the State Treasury even if they involve non-tax sources. On the other hand, you are apparently not the custodian of the University Trust Fund under § 85-129, and under §85-123.01, that fund may be held and managed as the Board of Regents shall determine. Therefore, we do not believe that funds accruing to the University Trust Fund need be receipted through the State Treasurer's office in the event that the Board of Regents elects to have those funds held and managed elsewhere.
 Question No. 5. "Are all University funds to be disbursed by the State Treasurer and Director of Administrative Services at the direction of the Board of Regents?" 
Again, there are Nebraska Statutes which specifically deal with this question. Neb. Rev. Stat. § 85-130 (1994) states, as is pertinent:
 The university funds, other than those created by taxation, shall be held subject to the order of the Board of Regents and shall be disbursed for the purposes prescribed by law, upon presentation of warrants to the Director of Administrative Services, to be issued on certificates of the Board of Regents executed as required by law, . . .
In addition, Neb. Rev. Stat. § 85-131 (1994) provides:
 Disbursements from the university funds shall be made by the State Treasurer upon warrants drawn by the Director of Administrative Services, who shall issue warrants upon certificates issued by the Board of Regents, signed by the secretary and president.
On the basis of those statutes, it appears to us that all University funds are to be disbursed by the State Treasurer and Director of Administrative Services at the direction of the Board of Regents with the exception of the university funds in the University Trust Fund. To the extent that those funds are not held by the State Treasurer as provided under § 85-123.01, then those funds would not be disbursed by the Treasurer at the direction of the Board of Regents.
 Question 6. "Does the University have statutory authority to establish a banking relationship to deposit the university funds described in [Neb. Rev. Stat. §] 85-125 [1996] and to disburse such funds independently instead of using normal state disbursement procedures?"
Your final question involves the University Cash Fund established by Neb. Rev. Stat. § 85-125 (1994). That statute states, as is pertinent:
 The University Cash Fund shall consist of the matriculation and diploma fees, registration fees, laboratory fees, tuition fees, summer session or school fees, all other money or fees collected from students by the authority of the Board of Regents for university purposes, and receipts from all university activities collected by the board in connection with the operation of the university. . . . All money accruing to the University Cash Fund shall become available when appropriated by the legislature for the use of the university and its activities and shall at all times be subject to the orders of the Board of Regents accordingly. No warrant shall be issued against such fund unless there is money in the hands of the State Treasurer sufficient to pay the same. The board shall cause all money belonging to this fund, which is received by its authority at the university, to be paid over from time to time, as the same is received, to the State Treasurer . . .
It appears to us that, under the express provisions of §85-125 together with §§ 85-130 and 83-131, cited above, the Board of Regents shall "cause all money belonging to the [University Cash Fund] . . . to be paid over . . . to the State Treasurer" where it can be disbursed by the State Treasurer and the Director of Administrative Services at the direction of the Board. Consequently, we do not believe that the University has statutory authority to establish a banking relationship in order to deposit the university funds described in § 85-125 and to disburse such funds independently rather than using normal state disbursement procedures.
We understand that it might be possible to argue, based upon the Exon case, supra, that application of § 85-125 to require the University to deposit its cash fund in the state treasury rather than having an independent banking relationship impermissibly intrudes upon the authority of the Board of Regents to govern the University. However, for the reasons discussed at length in response to your question No. 1 above, we do not believe that Exon requires a contrary reading of the statutes at issue. Moreover, we believe that the argument articulated in response to your Question No. 1 above with respect to the core duties of the State Treasurer is even more significant in this area, since it more clearly involves the Treasurer's traditional involvement in the State's banking relationships.
Sincerely yours,
 DON STENBERG Attorney General
 Dale A. Comer Assistant Attorney General
APPROVED BY:
Don Stenberg 
Attorney General
[1] Neb. Rev. Stat. § 77-1702 (Supp. 1997), which is part of Chapter 77 Article 17 of the Nebraska Statutes dealing with "Collection of Taxes," in turn, provides, as is pertinent: "[l]awful money of the United States, checks, drafts, credit cards, charge cards, debit cards, money orders, or other bills of exchange may be accepted in payment of any state, county, village, township, school district, other governmental subdivision tax, levy, excise, duty, custom, toll, penalty, fine, license, fee, or assessment of whatever kind or nature, whether general or special."
[2] Under Neb. Rev. Stat. § 13-1609 (5) (Supp. 1997) the committee in question includes the State Treasurer, the Director of Administrative Services, the State Tax Commissioner, and "representatives from counties, cities, and other political subdivisions as may be appropriate."
[3] In that regard it should be noted that the definition of "state agency" set out in the Tort Claims Act and in the Court's opinion is very broad.
[4] However, as discussed below, we believe that the University of Nebraska Board of Regents does have statutory authority to separately hold and manage the University Trust Fund under Neb. Rev. Stat. §§ 85-129 and 85-123.01 (1994). This would necessarily imply the right to establish a separate banking relationship for that fund.